# 24-15

## United States Court of Appeals
## for the Second Circuit

KAVASUTRA 6TH STREET, INC., KAVASUTRA 10TH STREET, INC.,

*Plaintiffs-Appellants,*

*against*

ERIC ADAMS, as Mayor of the City of New York, CITY OF NEW YORK, COMMISSIONER ASHWIN VASAN, as Commissioner of the New York City Department of Health and Mental Hygiene, and NEW YORK CITY DEPARTMENT OF HEALTH AND MENTAL HYGIENE,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of New York

## BRIEF FOR APPELLEES

RICHARD DEARING
MELANIE T. WEST
PHILIP W. YOUNG
*of Counsel*

July 3, 2024

MURIEL GOODE-TRUFANT
*Acting Corporation Counsel
of the City of New York*
Attorney for Appellees
100 Church Street
New York, New York 10007
(212) 356-2375 or -0842
phyoung@law.nyc.gov

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................iii

PRELIMINARY STATEMENT .................................................. 1

ISSUE PRESENTED FOR REVIEW ......................................... 3

STATEMENT OF THE CASE ................................................... 3

    A.  The City's regulation of food service establishments ................ 3

    B.  The FDA's determination that kava is an "unapproved food additive" ........................................................ 5

    C.  The City's inspections and closures of Kavasutra's bars for selling kava root mixed with water ..................................... 6

    D.  Kavasutra's lawsuit and motion for a preliminary injunction ...................................................... 10

    E.  The district court's order denying preliminary injunctive relief ...................................................... 13

SUMMARY OF ARGUMENT ................................................. 15

ARGUMENT ...................................................................... 18

THE DISTRICT COURT PROVIDENTLY EXERCISED ITS DISCRETION IN DENYING PRELIMINARY INJUNCTIVE RELIEF ...................................................................... 18

    A.  Kavasutra did not establish a clear or substantial likelihood of success on the merits. .......................................... 19

        1. Kava mixed with water is a "food additive" under the FDCA. .................................................................. 19

## TABLE OF CONTENTS (cont'd)

**Page**

2. Kavasutra's arguments to the contrary are meritless. ........ 24

B.  Kavasutra failed to show that it would suffer irreparable injury absent a preliminary injunction. ................................... 29

C.  The equities weigh in the City's favor. ..................................... 33

CONCLUSION ......................................................................................... 37

CERTIFICATE OF COMPLIANCE ...................................................... 38

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A.H. v. French*,
985 F.3d 165 (2d Cir. 2021) ................................................... 18, 19, 29

*Brenntag Int'l Chems., Inc. v. Bank of India*,
175 F.3d 245 (2d Cir. 1999) ................................................... 30

*CRP/Extell Parcel I, L.P. v. Cuomo*,
394 F. App'x 779 (2d Cir. 2010) ........................................... 29

*Freedom Holdings, Inc. v. Spitzer*,
408 F.3d 112 (2d Cir. 2005) ................................................... 15, 29, 30

*Freeplay Music, Inc. v. Verance Corp.*,
80 F. App'x 137 (2d Cir. 2003) ............................................. 32

*Green Haven Prison Preparative Meeting of Religious Soc'y of
Friends v. N.Y. State Dep't of Corr. & Cmty. Supervision*,
16 F.4th 67 (2d Cir. 2021) ..................................................... 15

*Hartford Courant Co., LLC v. Carroll*,
986 F.3d 211 (2d Cir. 2021) ................................................... 18

*Inmates of Attica Corr. Facility v. Rockefeller*,
453 F.2d 12 (2d Cir. 1971) ..................................................... 32, 33

*Jack Kahn Music Co. v. Baldwin Piano & Organ Co.*,
604 F.2d 755 (2d Cir. 1979) ................................................... 31

*JBR, Inc. v. Keurig Green Mt., Inc.*,
618 F. App'x 31 (2d Cir. 2015) ............................................. 33

*Leitner v. Westchester Cmty. Coll.*,
779 F.3d 130 (2d Cir. 2015) ................................................... 30

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Libertarian Party v. Lamont,*
    977 F.3d 173 (2d Cir. 2020) ............................................................... 19

*Marrache v. Bacardi U.S.A., Inc.,*
    17 F.4th 1084 (11th Cir. 2021) ..................................................... 4, 23

*Mazurek v. Armstrong,*
    520 U.S. 968 (1997) .............................................................................. 18

*Moore v. Consol. Edison Co. of N.Y., Inc.,*
    409 F.3d 506 (2d Cir. 2005) ............................................................... 18

*National Nutritional Foods Assoc. v. Kennedy,*
    572 F.2d 377 (2d Cir. 1978) ............................................................... 20

*Nemphos v. Nestle Waters N. Am., Inc.,*
    775 F.3d 616 (4th Cir. 2015) ...................................................... 4, 21, 22

*New York v. United States Dep't of Homeland Sec.,*
    969 F.3d 42 (2d Cir. 2020) ................................................................. 30

*Reuters Ltd. v. United Press Int'l, Inc.,*
    903 F.2d 904 (2d Cir. 1990) ............................................................... 31

*Rodriguez v. DeBuono,*
    175 F.3d 227 (2d Cir. 1998) ............................................................... 30

*Skidmore v. Swift & Co.,*
    323 U.S. 134 (1944) .............................................................................. 23

*Sussman v. Crawford,*
    488 F.3d 136 (2d Cir. 2007) ............................................................... 18

*Tom Doherty Assocs. v. Saban Entm't, Inc.,*
    60 F.3d 27 (2d Cir. 1995) ................................................................... 31

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*United States v. 29 Cartons * * * an Article of Food*, 987 F.2d
33, 35 (1st Cir. 1993).................................................................25

*United States v. 45/194 Kg. Drums of Pure Vegetable Oil*,
961 F.2d 808 (9th Cir. 1992)....................................................22

*United States v. An Article of Food*,
752 F.2d 11 (1st Cir. 1985) ......................................................22

*United States v. Two Plastic Drums*,
984 F.2d 814 (7th Cir. 1993)............................................ *passim*

*We the Patriots USA, Inc. v. Hochul*,
17 F.4th 266 (2d Cir. 2021) ......................................................36

*Winter v. NRDC, Inc.*,
555 U.S. 7 (2008)......................................................... 18, 33, 34

## Statutes

21 U.S.C. § 321(f).................................................................. 4, 21

21 U.S.C. § 321(s) ......................................................... *passim*

42 U.S.C. § 1983 .......................................................................10

## Other Authorities

21 CFR § 182.20 .......................................................................24

21 CFR § 189.180 .....................................................................24

24 RCNY § 3.01 ..........................................................................3

24 RCNY § 3.03 ..........................................................................3

24 RCNY § 71.05 .............................................................. 3, 7, 8, 9

24 RCNY § 71.11 ..........................................................................3

v

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

24 RCNY § 81.39 ................................................................. 3

N.Y. City Charter § 556................................................... 3, 35

## PRELIMINARY STATEMENT

Plaintiffs Kavasutra 6th Street, Inc. and Kavasutra 10th Street, Inc. (collectively, "Kavasutra") own two bars in Manhattan that sell a tea-like beverage made from kava—a plant with psychoactive properties that is consumed ceremonially and socially in the South Pacific. Following guidance from the Food and Drug Administration that kava is an "unapproved food additive" under federal law, New York City's Department of Health and Mental Hygiene (DOHMH) embargoed Kavasutra's kava products, barred Kavasutra from selling kava, and eventually closed its bars after Kavasutra repeatedly violated DOHMH's orders and interfered with its inspections. Kavasutra sued the Department, seeking declaratory and injunctive relief on the ground that kava is a "food" under federal law—and thus presumptively safe—rather than a presumptively unsafe "food additive." The U.S. District Court for the Southern District of New York (Caproni, J.) denied Kavasutra's motion for a preliminary injunction. This Court should affirm.

Kavasutra has failed to establish that it is entitled to preliminary injunctive relief. First, it has not established a clear and substantial likelihood of success on the merits of the key statutory interpretation

question in this case: whether kava mixed with water is a "food" or a "food additive" under federal law. The plain text of the relevant law makes clear that kava is a food additive when added to water, because it meets both the statutory criteria: (1) it is undisputedly "not generally recognized as safe," and (2) when mixed with water and filtered, it both becomes a component of and affects the characteristics of the water. Indeed, the combination results in an entirely new tea-like beverage. Kavasutra's arguments to the contrary are based on inapposite cases and a clear misreading of the district court's decision.

Second, Kavasutra has not established that it would be irreparably harmed absent an injunction. The only injury Kavasutra has asserted—lost income from the closure of its bars—is purely economic. And because economic injuries can be compensated with money damages, Kavasutra has not suffered an irreparable injury.

Finally, the balance of equities tips in DOHMH's favor. The Department has a strong public health interest in protecting New Yorkers from a substance that the FDA has determined is "not safe for human consumption"—an interest that outweighs Kavasutra's narrow commercial interest in selling an unapproved food additive.

2

## ISSUE PRESENTED FOR REVIEW

Did the district court providently deny Kavasutra's motion for a preliminary injunction where Kavasutra failed to show that it was likely to succeed on the merits and where the other preliminary-injunction factors weigh against an injunction?

## STATEMENT OF THE CASE

### A. The City's regulation of food service establishments

DOHMH is authorized to inspect food service establishments, N.Y. City Charter § 556; 24 RCNY § 3.01(a), and "seize, embargo or condemn" food that it determines is "adulterated or misbranded," 24 RCNY § 3.03(a); *see also id.* §§ 71.05(a) & 71.11. DOHMH is also authorized to close food service establishments, and suspend or revoke their licenses, where the establishment engages in "serious, repeated or persistent violations" of the City's Health Code, or where the establishment "interfere[s] with personnel of the Department in the performance of their duties." *Id.* § 81.39(c).

A food is "deemed adulterated" under the City's Health Code if, among other things, the "food is, bears or contains any food additive" that is not considered safe under the Federal Food, Drug, and Cosmetic Act (FDCA). 24 RCNY § 71.05(c). To determine whether a substance is a

3

"food" or a "food additive," DOHMH thus looks to federal law. The FDCA defines "food" as "articles used for food or drink for man or other animals … and … articles used for components of any such article." 21 U.S.C. § 321(f). Foods are "presumed safe," such that, in order to restrict or prohibit their use, the FDA bears the "burden of showing that the substance is injurious to health." *United States v. Two Plastic Drums*, 984 F.2d 814, 816 (7th Cir. 1993).

By contrast, a "food additive" is "any substance the intended use of which results … in its becoming a component or otherwise affecting the characteristics of any food …, if such substance is not generally recognized, among experts … as having been adequately shown through scientific procedures … to be safe under the conditions of its intended use." 21 U.S.C. § 321(s). Unlike food, food additives "generally are presumed unsafe until approved by the FDA." *Nemphos v. Nestle Waters N. Am., Inc.*, 775 F.3d 616, 627 (4th Cir. 2015). The FDA has promulgated regulations establishing the process for proving that a food additive is generally recognized as safe—*i.e.* "GRAS"—such that the substance may be added to food. *See Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084, 1093 (11th Cir. 2021).

4

## B. The FDA's determination that kava is an "unapproved food additive"

Kava is a "perennial shrub" and a "a member of the pepper family Piperacceae" (Joint Appendix ("A") 141). The root of the kava plant is used to produce a beverage with "psychoactive properties" that is consumed "ceremonially and socially" in the South Pacific (*id.*). It is traditionally prepared by macerating or grinding the kava root "and then mixing it with water or coconut milk … to form an emulsion. The mixture is agitated, and then strained through a cloth or bark filter" (A47, *see also* A141). Drinking kava produces "pleasant, mild" sensations and "generalized muscle relaxation," as well as a "numbing of the mucous membranes of the mouth and tongue" (A152). Recently, kava has become popular in some Western countries "as a recreational drink" (A141). Similar to the traditional South Pacific method, the beverage is "usually made from kava rhizome/root powder," which is "soaked in water … for about 30 minutes" and then "strain[ed] … through cloth" (A47).

Public health authorities have long been concerned about the negative effects of kava consumption on the liver and the central nervous system. For example, France, Switzerland, Spain, Hungary, Portugal, the Czech Republic, Canada, and the United Kingdom have all banned

kava based on "safety concerns over hepatotoxicity"—*i.e.* liver damage (A141).

In August 2020, the FDA engaged in a comprehensive review of published scientific literature about the safety of kava "for use in conventional foods" (A140). Based on that review, the agency concluded that "indiscriminate use of kava either as a 'recreational' or 'relaxation' beverage is not safe for human consumption" (A160). The FDA also noted that there "is no food additive regulation in effect that provides for the safe use of kava as an ingredient in conventional foods" (*id.*). Nor did the agency find any other basis for kava to be considered "generally recognized as safe (GRAS)" under FDA regulations, given the well-documented safety concerns about kava's toxic and carcinogenic properties (*id.*). The FDA thus concluded that kava was "an unapproved food additive when used as an ingredient in conventional foods" (*id.*).

## C. The City's inspections and closures of Kavasutra's bars for selling kava root mixed with water

Kavasutra owns two bars in Manhattan's East Village—one on First Street and one on Tenth Street (A15). The Tenth Street bar opened in July 2015 and the First Street bar opened in January 2020 (A17, 22),

6

just a few months before the FDA published its memorandum identifying kava as an "unapproved food additive" under the FDCA (A160). Both bars sold kava to customers in the form of a beverage, which they made by mixing kava root with water (A15, 20) and "run[ning] it through a filter in the same way that coffee or tea is made" (Brief for Appellant ("App. Br.") 20).

In August and November 2022, the City inspected both bars, and found large quantities of kava being offered for sale to customers (A85, 170-71). DOHMH inspectors ordered Kavasutra to stop selling kava beverages (A85) and issued summonses for various violations of the City's Health code (A79-80).[1] They also embargoed the kava products stored at both bars, on the ground that they were "adulterated, contaminated, obtained from an unapproved source or otherwise unfit for human consumption" (A170-71; *see also* A85).

---

[1] In March 2023, an administrative law judge sustained many of the violations DOHMH found when the agency conducted its November 2022 inspection of the First Street bar (A79). However, the judge dismissed the violation of 24 RCNY § 71.05 on the ground that Kavasutra was not using kava "as an additive" (A79-80). DOHMH did not appear at that hearing (A80). Since then, however, administrative law judges have repeatedly sustained the violations of 24 RCNY § 71.05 that DOHMH has issued to Kavasutra for selling kava mixed with water (*see* S.D.N.Y. Dkt. 46-1 – 46-6).

In January 2023, DOHMH reinspected Kavasutra's Tenth Street bar and found that it was still selling kava beverages in violation of the agency's August 2022 orders (A83-84). DOHMH also discovered that the kava products it had embargoed in August 2022 were improperly removed from the bar without the agency's permission (A85). DOHMH issued Kavasutra a summons for violating its August 2022 orders (A85-87). It also issued Kavasutra a separate summons for selling kava beverages in violation of 24 RCNY § 71.05 (A88-89). DOHMH explained that, according to the FDA, kava "is not Generally Recognized as Safe (GRAS)" and is "not an approved food colorant or food additive" (A89). Finally, DOHMH entered an order directing the Tenth Street bar to stop selling food or beverages containing kava (A188).

In July 2023, DOHMH performed another inspection of Kavasutra's Tenth Street bar. Kavasutra's employees tried to stop the inspection by ordering the inspectors to leave and by calling the police (A192-93). The police, however, helped DOHMH complete the inspection (*see id.*). Once again, the Department found that Kavasutra was selling kava beverages in violation of 24 RCNY § 71.05 and the agency's previous orders (A191). DOHMH entered a new order directing the closure of the Tenth Street

bar until Kavasutra "presented proof that the establishment's continued operation does not present a danger to public health and the Department has authorized reopening" (A195-96).

One day later, DOHMH reinspected Kavasutra's First Street bar (A96-97). The inspectors were "verbally harassed" by a Kavasutra employee who blocked them from accessing the basement, turned the heat "to max," and "played extremely loud music" (A97). The employee also spoke on the phone with another employee, who directed the inspectors to "get out of my fucking restaurant" and stated, "do not allow this fucking inspector to continue his faggot inspection" (*id.*). DOHMH nevertheless completed its inspection, which revealed substantial quantities of kava products (A96). It issued a summons to Kavasutra for selling kava beverages in violation of 24 RCNY § 71.05, for violating the agency's November 2022 embargo order, and for preventing the inspectors from carrying out their duties (A96-98). As with the Tenth Street location, DOHMH entered an order directing the closure of the bar (A103-04).

One week later, DOHMH found both bars open and serving customers in blatant violation of the closing orders (A176, 198). At each

9

location, Kavasutra had obscured the closure signs with posters and potted plants (*id.*). DOHMH issued new summonses to Kavasutra and re-closed the bars (*id.*). In the new closure order, DOHMH explained that, according to the FDA, kava was an "unapproved food additive" under the FDCA, and thus could not be added to any food (A178-79). The agency also noted that FDA regulations do not treat kava as a substance that is "generally recognized as safe" (A179). Instead, it explained that "toxicological data has demonstrated that use of Kava" can cause "liver damage, cirrhosis, hepatitis, and liver toxicity in humans" (A178).

## D. Kavasutra's lawsuit and motion for a preliminary injunction

Shortly after DOHMH issued the July 2023 closure orders, Kavasutra filed this lawsuit (A14-19). Claiming that kava should be treated as a "food" rather than a "food additive," Kavasutra sought a declaration "that under the FDCA, [DOHMH] may not restrict, interfere or prevent" the "sale of Kava as a food" (A18). Kavasutra also sought an injunction "enjoin[ing]" DOHMH "from restricting, interfering or preventing" the sale of Kava for the same reason (*id.*). Finally, Kavasutra asserted a due process claim under 42 U.S.C. § 1983, alleging that

DOHMH closed Kavasutra's bars "without any pre-deprivation process" (A18-19).

Kavasutra also moved for a preliminary injunction to "enjoin[]" DOHMH "from restricting, interfering, harassing, or otherwise preventing the sale of Kava as a single ingredient food" (A9). Kavasutra argued that it was likely to succeed on the merits of its claims because kava is properly classified as a "food" under the FDCA, rather than as a "food additive" (A110, 115-17). Kavasutra also argued that it would be irreparably harmed absent an injunction because its business "centers around the sale of Kava" and, without those sales, it would "go out of business" (A110, 118-19). In support of that claim, Kavasutra attached a declaration from Michael Klein, its Chief Operating Officer (A20-24). Klein identified the monthly rent at both bars and asserted that, because of the closure orders, Kavasutra was "without any income" and would "lose its customer base" (A23-24). Klein, however, did not provide the court with any additional information about Kavasutra's sales and income, the food and beverages it sold, or its customer base (*see id.*).

DOHMH opposed the motion (A134-35).[2] It attached a copy of the FDA's August 2020 memorandum concluding that kava is "an unapproved food additive when used as an ingredient in conventional foods" (A160). DOHMH also pointed the district court to guidance it had shared with food service operators about "adulterated foods" (A213). In that guidance, the Department explained that kava is "not approved" "to be added to food" by New York State or the federal government (*see id.*). In October 2023, while Kavasutra's motion was pending, DOHMH shared with the district court a memorandum from the New York State Department of Health about kava (S.D.N.Y. Dkt. 32). The memorandum explained that, because the FDA considers kava "an unapproved food additive," foods containing kava "including water (*i.e.* as a tea)" are "considered adulterated and constitute an imminent health hazard" under State law (*id.*).

---

[2] At the same time, DOHMH also cross-moved to dismiss the complaint (A134-35). In September 2023, the district court denied the motion as moot, after Kavasutra filed an amended complaint and DOHMH answered (S.D.N.Y. Dkt. 28).

### E. The district court's order denying preliminary injunctive relief

The district court denied Kavasutra's motion for a preliminary injunction (A264-65). It began by explaining that because Kavasutra's requested "preliminary injunction would alter the status quo" "by commanding some positive act"—*i.e.* forcing DOHMH to reverse its closure orders and permit the sale of kava—Kavasutra was required to "satisfy a heightened standard" (A258). And the court concluded that Kavasutra had not cleared that high bar (A257).

First, the court held that Kavasutra had not established a clear or substantial likelihood of success on the merits of its claims. The court identified the "central question in this lawsuit" as whether kava is a "food" or a "food additive" under the FDCA (A259). After quoting the statutory definitions of both terms, the district court summarized the parties' arguments (A259-60). She explained that, according to Kavasutra, kava is a "food" that is "presumed safe" under the FDCA because it is a "single-ingredient tea brewed in water" (A260). DOHMH on the other hand, argued that mixing kava in water "makes it a 'food additive'" (*id.*). And, the district court explained, since "the FDA has not found that kava is GRAS," DOHMH believed that it "was correct to order

13

[Kavasutra] to cease selling kava tea" (*id.*). The district court ultimately concluded that "[b]ecause both sides made colorable arguments" about the statutory definition of "food additive," the court could not conclude that Kavasutra was likely to prevail on the merits (A261). Because of that holding, the district court declined to consider whether Kavasutra had "demonstrated irreparable harm" (*id.*).

But the court did reach the third prong of the preliminary injunction inquiry and found that the balance of the equities tipped in DOHMH's favor (A261-62). It noted that the FDA—the agency responsible for "the safety of the nation's food supply"—had concluded that kava "is not safe for human consumption" in light of "safety concerns over hepatotoxicity" (A261-62). And the court pointed out that several countries had banned kava altogether in light of those safety concerns (A262). The court also acknowledged that city and state public health officials had concluded that kava should not "be added to food" because of its "negative effects on human health," and that DOHMH "issued the closing orders in the interest of public safety" (*id.*). Thus, the court held that it was "not in the public interest" for it to substitute its own views

14

"of what is or is not safe for human consumption" for the views of public health experts (*id.*).

## SUMMARY OF ARGUMENT

This Court reviews the district court's denial of a preliminary injunction motion for an abuse of discretion, examining legal conclusions *de novo* and factual findings for clear error. *Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67, 78 (2d Cir. 2021). The Court may affirm the denial on any basis apparent in the record. *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005). Here, the district court providently exercised its discretion in denying Kavasutra's motion for a preliminary injunction.

To start, Kavasutra failed to establish a clear or substantial likelihood of success on the merits of its declaratory and injunctive claims. The success of those claims depends on a question of pure statutory interpretation: whether kava mixed with water is a "food" or a "food additive" under the FDCA. The statutory text, case law, and the FDA's regulations and guidance all confirm that kava is a "food additive" when added to water.

15

The FDCA's definition of "food additive" contains two elements. The "substance" in question must (1) "becom[e] a component or otherwise affect[] the characteristics of any food," and (2) not be generally recognized as safe (GRAS). 21 U.S.C. § 321(s). Here, the FDA has determined that kava is not GRAS, and Kavasutra does not argue otherwise. As to the second element, kava becomes a "component" of water when Kavasutra mixes kava powder with water and filters it, under any ordinary interpretation of the word. Kava also "affect[s] the characteristics" of the water by becoming suspended in the water and creating an entirely new beverage, like coffee or tea.

That straightforward interpretation of the FDCA is confirmed by case law treating similar substances as food additives. It is also supported by FDA regulations and guidance. In August 2020, the FDA published a memorandum determining that kava is "an unapproved food additive when used as an ingredient in conventional foods." And the FDA's regulations treat substances similar to kava as unapproved food additives, such as "sassafras bark," which is used to make sassafras tea.

Kavasutra's arguments to the contrary are meritless. The two cases it primarily relies on are inapposite. Both involved black currant oil

16

enclosed in a capsule made of glycerin and gelatin. The capsule served solely as a container to combat rancidity and thus did not interact with or change the character of the black currant oil in any way, unlike the kava root powder that Kavasutra mixes with water and filters to create a new beverage. And Kavasutra's further claim that the district court abused its discretion by focusing solely on the safety of kava, rather than the statutory definition of "food additive," is based on a clear misreading of the record.

In any event, Kavasutra has not satisfied the other two preliminary injunction factors. The harms Kavasutra alleges are economic injuries that can be compensated with monetary damages, so they are not irreparable. And Kavasutra has not produced any nonconclusory evidence that it is threatened with the total loss of its business or that its purported loss of customer goodwill would be incalculable. Finally, the district court properly concluded that the balance of equities tips decisively in DOHMH's favor, since the Department's decision to take action to protect New Yorkers from a substance that the FDA considers "not safe for human consumption" outweighs Kavasutra's narrow commercial interests in selling an unapproved food additive.

17

## ARGUMENT

## THE DISTRICT COURT PROVIDENTLY EXERCISED ITS DISCRETION IN DENYING PRELIMINARY INJUNCTIVE RELIEF

A preliminary injunction is "an extraordinary and drastic remedy." *Sussman v. Crawford*, 488 F.3d 136, 139 (2d Cir. 2007); *Moore v. Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506, 510 (2d Cir. 2005). To obtain one, a movant must establish four factors: (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in his favor," and (4) "an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). The third and fourth factors merge when the government is the opposing party. *Hartford Courant Co., LLC v. Carroll*, 986 F.3d 211, 224 (2d Cir. 2021). The movant must, "by a clear showing, carr[y] the burden of persuasion" as to each factor. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (cleaned up).

The standard for relief is particularly high where, as the district court here recognized (*see* A258), a plaintiff seeks to modify the status quo through a mandatory preliminary injunction, rather than to maintain the status quo, *see A.H. v. French*, 985 F.3d 165, 176 (2d Cir.

18

2021). Under this "exacting" standard, *Libertarian Party v. Lamont*, 977 F.3d 173, 176-77 (2d Cir. 2020), the plaintiff bears the burden of establishing a "clear or substantial likelihood" of success on the merits, along with all of the other factors, *A.H.*, 985 F. 3d at 176 (cleaned up). Here, Kavasutra has failed to satisfy its burden of persuasion on all three factors.

## A. Kavasutra did not establish a clear or substantial likelihood of success on the merits.

### 1. Kava mixed with water is a "food additive" under the FDCA.

To start, the district court soundly concluded that Kavasutra failed to establish a clear or substantial likelihood of success on the merits of its claims for declaratory and injunctive relief. As the district court recognized, the success of those claims turns on a question of federal statutory interpretation: whether kava, when mixed with water and filtered, is a "food" or a "food additive" under the FDCA (A259). The text of the FDCA, case law, and the FDA's own regulations and guidance all confirm that kava is a "food additive" when added to water, filtered, and sold to customers as a tea or other similar beverage.

19

Start with the text. *See Two Plastic Drums*, 984 F.2d at 817 ("In determining what is a food additive, we look first to the language of the statute itself"). Under the FDCA, a "food additive" is "any substance the intended use of which results … in its becoming a component or otherwise affecting the characteristics of any food …, if such substance is not generally recognized, among experts … as having been adequately shown through scientific procedures … to be safe under the conditions of its intended use." 21 U.S.C. § 321(s). The definition has two parts. First, the substance must "becom[e] a component or otherwise affect[] the characteristics of any food." *Id.* And second, the substance must not be GRAS. *Id.*; *see also National Nutritional Foods Assoc. v. Kennedy*, 572 F.2d 377, 391 (2d Cir. 1978) ("The sole criterion for identifying a food additive is whether a substance which may become a component of or affect the characteristics of any food be not generally recognized among qualified experts as having been shown to be safe").

Kava satisfies both parts of that definition. Starting with part two, there is no dispute that kava is not GRAS (*see* A160 ("there is no basis to conclude that the use of kava as an ingredient in conventional foods is GRAS")). Indeed, Kavasutra's entire argument rests on the premise that

20

because kava is supposedly a conventional "food" under the FDCA, it does not have to prove that kava is GRAS to prevail in this appeal (*see* App. Br. 20-23).

Next, consider the first part of the "food additive" definition: "any substance the intended use of which results … in its becoming a component or otherwise affecting the characteristics of any food." 21 U.S.C. § 321(s). That part of the definition itself contains two subparts. The "substance" must both (a) become a component of food, and (b) affect the characteristics of food. *See Two Plastic Drums*, 984 F.2d at 817-18 (explaining that, because the phrase "or otherwise" in the FDCA is "not used to express two alternative definitions of a food additive," the "substance must not only be added to food, but it must also have the purpose or effect of altering a food's characteristics").

Kava, as prepared and sold by Kavasutra, does both. When Kavasutra mixes kava root powder with water and filters it to create a new beverage, the kava becomes a "component" of the water, under any ordinary interpretation of the word.[3] *See Two Plastic Drums*, 984 F.2d at

---

[3] Water is a "food" under the FDCA. *See* 21 U.S.C. § 321(f) ("The term 'food' means (1) articles used for food or drink for man or other animals"); *see also Nemphos*, 775 F.3d

*(cont'd on next page)*

817 ("The term 'component,' [is] commonly understood and defined as []
'a constituent part' or 'ingredient'"). Further, the kava also "affect[s] the
characteristics" of the water, 21 U.S.C. § 321(s), by creating a new water-
based suspension comprised of kava root powder and water. The two
substances are combined, mixed, and filtered to create an entirely new
beverage, like coffee or tea (*see* App. Br. 20 ("Here, Plaintiffs mix kava
root with water and run it through a filter in the same way that coffee or
tea is made")). So, because kava is not GRAS, and because kava becomes
a component of water and affects the characteristics of water when mixed
with water and filtered, kava is a "food additive" under the FDCA.

Case law confirms that straightforward interpretation of the
statute. *See, e.g.*, *United States v. An Article of Food*, 752 F.2d 11, 13, 16
(1st Cir. 1985) (holding that potassium nitrate, when added to soft drinks
"for the purpose of developing and fixing a desirable color and flavor," is
a "food additive" under the FDCA); *United States v. 45/194 Kg. Drums of
Pure Vegetable Oil*, 961 F.2d 808, 811-13 (9th Cir. 1992) (holding that

---

at 622 ("The FDA regulates bottled water as a food"). The New York State
Department of Health similarly treats water as a "food" (S.D.N.Y. Dkt. 32).

evening primrose oil, when mixed with Vitamin E and placed in soft gelatin capsules, is a "food additive" under the FDCA).

FDA guidance and regulations likewise support the conclusion that kava is a "food additive" under the FDCA when prepared and sold to customers as a beverage. First, as we have already explained (*see supra* at 6), the FDA published a memorandum in August 2020 concluding that kava is "an unapproved food additive when used as an ingredient in conventional foods" (A160). Based on that conclusion, the New York State Department of Health determined that adding kava to water "as a tea" would render the resulting beverage adulterated under State law (S.D.N.Y. Dkt. 32). Although the FDA has not promulgated formal regulations governing the use and sale of kava, the August 2020 memorandum, at the very least, provides some support for the conclusion that kava is a "food additive" under the FDCA. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

Second, that conclusion is bolstered by the FDA's regulations "establishing and explaining its 'generally recognized as safe' ('GRAS') regulatory regime for food additives." *Marrache*, 17 F.4th at 1093. Those regulations show that the FDA has treated substances similar to kava as

23

"food additives." For example, the FDA classifies "safrole"—a "natural constituent of the sassafras plant"—as a food additive that is not GRAS. 21 CFR § 189.180. Indeed, the regulation specifically notes that "sassafras bark" is an adulterated food additive when it is used "as a vehicle" for "imparting" safrole to "sassafras tea." *Id.* On the other hand, FDA regulations provide that substances like coffee, tea, bergamot, and chamomile are "generally recognized as safe," 21 CFR § 182.20, and are not food additives. In other words, the FDA has treated some substances mixed with water—but not others—as food additives, depending on whether or not they are GRAS. Like the FDA's August 2020 memorandum, those regulations provide further support for classifying kava as a "food additive" under the FDCA.

## 2. Kavasutra's arguments to the contrary are meritless.

Kavasutra and amicus American Herbal Products Association argue that kava cannot be a food additive in this context because it is a "single food" mixed with "an inactive substance"—water (App. Br. 15; *see also id.* at 19-21; Brief for American Herbal Products Association

24

("Amicus Br.") 2, 6-9). But the two cases that Kavasutra and the amicus cite—*Two Plastic Drums* and *29 Cartons*—do not support that claim.

Both cases involved black currant oil (BCO) encased in capsules made of gelatin and glycerin, not a powder mixed with water and filtered. *Two Plastic Drums*, 984 F.2d at 816; *United States v. 29 Cartons * * * an Article of Food*, 987 F.2d 33, 35 (1st Cir. 1993). The First and Seventh Circuits held that BCO was not a "food additive" in that context because it did not "affect the characteristics" of the gelatin and glycerin capsule in any way. *Two Plastic Drums*, 984 F.2d at 817-20; *29 Cartons*, 987, F.2d at 37-38. The gelatin and glycerin "d[id] not interact with or change the character of the BCO, but merely act[ed] as a container comparable to a bottle." *Two Plastic Drums*, 984 F.2d at 817. The capsule allowed the consumer to "ingest predetermined quantities of BCO" and "protect[ed] the BCO from rancidity." *29 Cartons*, 987, F.2d at 35.

Kava mixed with water is not analogous to BCO encased in a capsule. Kavasutra mixes kava powder into water and filters it to create an entirely new beverage (A15-16, 21; App. Br. 20). The role of the water is not to "merely act as a container," *Two Plastic Drums*, 984 F.2d at 817, but rather to serve as one of two separate ingredients that are combined

25

and mixed to create a water-based suspension. Unlike BCO, which did not interact with or affect the characteristics of the gelatin and glycerin capsule, the kava affects the characteristics of the water by forming a water-based suspension that amounts to an entirely new drink. It is thus a food additive under the FDCA.

Kavasutra and the amicus are also wrong that DOHMH's straightforward interpretation of the FDCA amounts to an "end-run around the statutory scheme" governing food additives (App. Br. 21; Amicus Br. 7). The FDA's "Alice-in-Wonderland approach" to statutory interpretation that the Seventh Circuit rejected is not the interpretation of the FDCA that DOHMH is advocating for here.

In *Two Plastic Drums*, the FDA argued for a disjunctive interpretation of the FDCA under which a substance was a food additive if it either (a) was a component of food, or (b) affected the characteristics of food. 984 F.2d at 817. The Seventh Circuit rejected that interpretation because it "distort[ed] the plain meaning of the provision" and because it would create an "Alice-in-Wonderland approach" to statutory interpretation under which "every component of food" was a food additive

and "even the addition of water to food would make the food a food additive." *Id.* at 817, 819.

Here, however, DOHMH is not arguing that a substance is a food additive whenever it is a component of food. The Department agrees that the substance must also "affect[] the characteristics" of the food to be a food additive. 21 U.S.C. § 321(s). And, for all of the reasons explained above, kava affects the characteristics of water when it is mixed into water and filtered to create a new beverage. For that reason, the amicus is wrong that DOHMH's interpretation of the FDCA would "effectively establish a premarket approval requirement for all foods" (Amicus Br. 7 (emphasis omitted)). Premarket approval is only required where the substance being added to food affects the food's characteristics and is not already GRAS. Indeed, that is exactly what the statute says. *See* 21 U.S.C. § 321(s).

Finally, Kavasutra's argument that the district court abused its discretion by focusing on "the safety of Kava" rather than the statutory definition of "food additive" is based on a clear misreading of the record (App. Br. 15, 21-23). The district court did not hold that "the conflicting evidence on [the] safety [of kava] was in equipoise" (*id.* at 21-22). It held

27

that the parties' positions were "at equipoise" because they both "made colorable arguments" about whether kava satisfied the statutory definition of a "food additive" (A259-61).

Indeed, the district court properly identified the "central question in this lawsuit" as whether kava is a "food" or a "food additive" (A259). It then quoted the definitions of both terms in the FDCA and summarized the parties' conflicting statutory interpretation arguments (A259-60). In the course of that discussion, the district court noted that "the FDA has not found that kava is GRAS" (A260), since that is an element of the "food additive" definition. *See* 21 U.S.C. § 321(s). But the district court never discussed or analyzed any conflicting evidence suggesting that kava was safe for humans. The district court based its conclusion that both parties' positions were "at equipoise" on the parties' statutory interpretation arguments, not their arguments about whether kava was safe (A259-61).

In short, Kavasutra is not likely to succeed on the merits of its declaratory and injunctive claims because kava is a "food additive" under the FDCA, not a "food." But even if this Court declines to definitively resolve that statutory interpretation question on an incomplete preliminary injunction record, and concludes—as the district court did—

28

that "both sides made colorable arguments" (A261), it would make no difference. If the parties' positions are "at equipoise" (*id.*), it would mean that Kavasutra has failed to establish a clear or substantial likelihood of success on the merits, *A.H.*, 985 F. 3d at 176, as the district court recognized. This Court can affirm on that basis alone, without reaching the other preliminary injunction factors.

### B. Kavasutra failed to show that it would suffer irreparable injury absent a preliminary injunction.

In any event, Kavasutra also failed to prove that it would suffer irreparable harm absent a preliminary injunction, which is an independent justification for denying the motion. *See CRP/Extell Parcel I, L.P. v. Cuomo*, 394 F. App'x 779, 782 (2d Cir. 2010). Although the district court did not reach the irreparable harm question (A261), this Court can still affirm on that alternative ground. *See Freedom Holdings, Inc.*, 408 F.3d at 114.

To satisfy the irreparable harm requirement a plaintiff must prove that, absent a preliminary injunction, "they will suffer 'an injury that is neither remote nor speculative, but actual and imminent,' and one that cannot be remedied 'if a court waits until the end of trial to resolve the

harm.'" *Freedom Holdings, Inc.*, 408 F.3d at 114 (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 234-35 (2d Cir. 1998)). Thus, mere economic injury is generally insufficient to establish irreparable harm, since that injury can be "estimated and compensated" by an award of monetary damages. *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999); *see also New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 86 (2d Cir. 2020).

Here, Kavasutra's alleged injury is purely economic—the loss of income caused by DOHMH's closures of its bars (*see* A24, 118-19; *see also* App. Br. 23-24). And Kavasutra has not established that those economic injuries could not be remedied by an award of monetary damages. Kavasutra is not a new business. Its Tenth Street bar opened in 2015 and its First Street bar opened in 2020 (A17). Calculating the income Kavasutra has purportedly lost while its bars have been closed should be a simple and straightforward exercise.[4]

---

[4] Kavasutra's suggestion that the Eleventh Amendment might prevent it from recovering monetary damages (App. Br. 24), is meritless. The Eleventh Amendment applies to states, not local governments like New York City. *See Leitner v. Westchester Cmty. Coll.*, 779 F.3d 130, 134 (2d Cir. 2015) ("Sovereign immunity does not, however, extend to local governments or municipalities").

To get around this problem, Kavasutra argues that monetary damages would be a "hollow promise," because DOHMH's actions "disrupt[ed] the sale" of its "primary product" and caused a loss of customer goodwill (App. Br. 18-19, 23-24). True, in rare circumstances this Court has found irreparable harm where a plaintiff is threatened with the loss of its business or where it loses access to a "unique product," *Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27, 37 (2d Cir. 1995), that creates "incalculable" losses, *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 908-09 (2d Cir. 1990). But this Court has also been clear that where "the loss of a profitable line of business" leads to "provable monetary damages," there is no irreparable harm. *Tom Doherty Assocs.*, 60 F.3d at 37 (citing *Jack Kahn Music Co. v. Baldwin Piano & Organ Co.*, 604 F.2d 755, 763 (2d Cir. 1979)).

Kavasutra has not produced any nonconclusory or nonspeculative evidence of incalculable losses.[5] Nor has it established that "it would have

---

[5] Indeed, Kavasutra's irreparable harm arguments ring particularly hollow here because, upon information and belief, both of its bars remain open and operating in blatant violation of DOHMH's closing orders (*see, e.g.*, @kavasutra_ny, Instagram (Jan. 12, 2024), https://www.instagram.com/p/C2AqbKpgGdH/ (post promoting party at Kavasutra's Tenth Street Bar); @redonionnyc, Instagram (May 24, 2024), https://www.instagram.com/p/C7XM76SuoCD/ (post promoting discount for Kavasutra customers at nearby restaurant)).

31

no business to conduct" if it could no longer sell kava. *Freeplay Music, Inc. v. Verance Corp.*, 80 F. App'x 137, 138-39 (2d Cir. 2003).

The sole evidence of irreparable harm that Kavasutra presented was a conclusory declaration from its Chief Operating Officer, Michael Klein (A20-24). In that declaration, Klein asserted that Kavasutra is "without any income" since DOHMH closed its bars (A24). And, according to Klein, without income, Kavasutra "cannot continue to operate and shall lose its customer base" (*id.*). Klein, however, provided no further evidence to support that conclusory assertion. Although Kavasutra claims that kava-related beverages are its "primary product" (App. Br. 23), Klein did not provide the district court with a list of the products that Kavasutra sells, or a breakdown of how much income Kavasutra derives from each product. Klein did not explain why Kavasutra could not reopen its bars and sell the other products on its menu that do not contain kava. And Klein did not provide the district court with any information about its customer base, nor why the loss of some of its customers could not be quantified and compensated with monetary damages.

As the party seeking a preliminary injunction, Kavasutra had the burden to show irreparable injury. *See, e.g., Inmates of Attica Corr.*

32

*Facility v. Rockefeller*, 453 F.2d 12, 20 (2d Cir. 1971). Kavasutra's complete failure to produce non-speculative evidence of irreparable harm is thus fatal to its request for injunctive relief. *See JBR, Inc. v. Keurig Green Mt., Inc.*, 618 F. App'x 31, 35 (2d Cir. 2015) (no abuse of discretion "in declining preliminary injunctive relief, in light of the sparse evidence proffered by [the movant] to demonstrate irreparable injury").

## C. The equities weigh in the City's favor.

Finally, as the district court correctly held, the balance of equities tips decisively in DOHMH's favor because its "actions to restrict plaintiffs from selling kava are calculated to protect the health of New Yorkers" (A261-62). That is another independent reason to affirm the district court's decision. *See Winter*, 555 U.S. at 23-24.

Numerous public health authorities have concluded that kava is dangerous to humans. Kava is already banned in Canada and many European countries—including France and the United Kingdom—because of concerns about hepatotoxicity (A141). And, for similar reasons, the federal government and the State of New York have both concluded that kava consumption is dangerous to humans.

33

The FDA has been concerned about the negative health effects of kava since at least 2002. That year, it "issued a consumer advisory and a letter to healthcare professionals … expressing concern about liver damage in individuals who have ingested kava products" (A141). More recently, in August 2020, the FDA performed a comprehensive review of scientific literature concerning the safety of kava (A140-67). It found study after study concluding that kava has hepatotoxic and carcinogenic properties and that consumption of kava can lead to liver damage (A145-52, 154-59). Based on that review, the FDA "conclude[d] that there is enough toxicological data that demonstrates that indiscriminate use of kava either as a 'recreational' or 'relaxation' beverage is not safe for human consumption" (A160). It thus classified kava as "an unapproved food additive when used as an ingredient in conventional foods" (*id.*).

New York State has followed that guidance and recently sent a memo to city and county health departments clarifying that, because the FDA determined that kava is not an approved food additive, all "foods, *including water (i.e. as a tea)*, that contain kava … are considered adulterated and constitute an imminent health hazard" under State law (S.D.N.Y. Dkt. 32 (emphasis added)).

34

DOHMH is thus not engaging in "wrongful enforcement of the law," as Kavasutra claims (App. Br. 16, 24). Its enforcement actions against Kavasutra are entirely consistent with the guidance provided by federal and state public health authorities. Nor is DOHMH "misinterpreting" or otherwise engaging in a "wrongful application of the FDCA" (*id.* at 24-25). For all of the reasons discussed above (*see supra* at 19-29), kava, when mixed with water, is a "food additive" under the FDCA.

Kavasutra is also mistaken in its further argument that "denying the preliminary injunction" would "add[] nothing to [DOHMH]'s legitimate efforts to promote public health" (App. Br. 26). Kavasutra is selling to the public an unapproved food additive that is "not safe for human consumption" because of its hepatotoxic and carcinogenic properties (A160). The district court's decision to deny Kavasutra preliminary injunctive relief gives DOHMH the right to continue protecting New Yorkers from the dangerous health effects of kava consumption—a central component of the Department's public health mission. *See generally* N.Y. Charter § 556.

For all of those reasons, the district court correctly concluded that the equities weigh in DOHMH's favor because it acted "in the interest of

public safety" to "protect the health of New Yorkers" (A261-62). *See We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 295 (2d Cir. 2021) (balance of equities tipped in State's favor in challenge to vaccine mandate, where it had a strong "interest in maintaining the safety within healthcare facilities during the pandemic"). DOHMH's broad public health interest in protecting New Yorkers from a substance that the FDA has determined "is not safe for human consumption" (A160), outweighs Kavasutra's narrow commercial interest in selling an unapproved food additive.

## CONCLUSION

This Court should affirm the district court's order.


Dated:  New York, NY
        July 3, 2024

                             Respectfully submitted,

                             MURIEL GOODE-TRUFANT
                             *Acting Corporation Counsel*
                             *of the City of New York*
                             Attorney for Appellees

By: _____
                             PHILIP W. YOUNG
                             Assistant Corporation Counsel

                             100 Church Street
                             New York, NY 10007
                             (212) 356-2375
                             phyoung@law.nyc.gov

RICHARD DEARING
MELANIE T. WEST
PHILIP W. YOUNG
   *of Counsel*

37

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief was prepared using Microsoft Word, and according to that software, it contains 7,199 words, not including the table of contents, table of authorities, this certificate, and the cover.

_____
PHILIP W. YOUNG